UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BYRON L. JOHNSON,

    Plaintiff,

v.                                             CAUSE NO. 3:22-CV-200 DRL

CITY OF WABASH *et al.*,

    Defendants.

OPINION AND ORDER

On October 1, 2020, Byron L. Johnson, now proceeding *pro se*, was pulled over for driving at night without his headlights activated. He sued the City of Wabash and Wabash Police Officers Drew Bender and Colin Gouveia (collectively the City of Wabash Defendants) and Wabash County Sheriff Ryan Baker and Wabash County Sheriff's Deputies Corey Phillipy and Derek Leckrone (collectively the Sheriff Defendants) under 42 U.S.C. § 1983 alleging that the traffic stop violated the Fourth Amendment. He also says the incident constituted false arrest and false imprisonment under Indiana law and that Officer Bender defamed him when he communicated false allegations to Mr. Johnson's employer. All defendants now request summary judgment. Due to the common issues, the court addresses both sets of motions together for the sake of judicial economy. The court grants the motions.

BACKGROUND

Because both motions are effectively uncontested by Mr. Johnson,[1] the court deems all supported factual assertions by the defendants to be true. *See* Fed. R. Civ. P. 56(e)(2). On October 1, 2020, Mr. Johnson was giving his friend, Scott Jackson, a ride in his truck [52-1 at 38-39]. The truck's lights had to be turned on manually [*id*. 181]. Mr. Johnson was leaving a gas station parking lot, not turning the headlights on until he got to the street [*id*. 32-33, 180].

---

[1] Mr. Johnson filed a two-paragraph affidavit, though it is largely inadmissible. *See infra* Part A.

At 10:06 p.m., Deputy Corey Phillipy initiated a traffic stop of Mr. Johnson for driving without his headlights on [*id.* 32, 40; 54-2 at 2; 54-5 at PDF 3]. Upon approaching the truck, Deputy Phillipy recognized Mr. Johnson from previous interactions [52-2 ¶ 8]. Mr. Johnson had recently been present at a residence where Deputy Phillipy assisted in executing a search warrant where illegal narcotics, paraphernalia, and other evidence of drug dealing were seized [*id.* ¶ 11].

When Deputy Phillipy approached, Mr. Johnson acknowledged that he knew he didn't have his headlights on [52-1 at 49-50; 52-2 ¶ 9]. Deputy Phillipy confirmed that is why he was pulled over and asked for Mr. Johnson's driver's license [*id.*]. Mr. Johnson says that at this point, there were "five other cop cars behind [Deputy Phillipy's]" [52-1 at 50-51]. After gathering the documents from Mr. Johnson, Deputy Phillipy returned to his squad car to run Mr. Johnson's information [52-2 ¶ 10]. He began writing out a warning for driving with no headlights [*id.* ¶ 11]. At 10:08 p.m., Deputy Phillipy requested that Officer Bender, of the Wabash Police K-9 Unit, come to the scene [*id.*; 54-5 PDF 3].

Deputy Leckrone was only two blocks away when he heard Deputy Phillipy's request for a canine dispatch, so he decided to assist with the traffic stop and arrived quickly [52-3 ¶ 5]. Officer Bender also arrived quickly [52-1 at 52], no more than five minutes after the traffic stop was initiated or by 10:11 p.m. at the latest [54-3 ¶ 7]. After conferring with Deputy Phillipy about the reason for the stop, Officer Bender conducted a free air sniff around Mr. Johnson's truck [*id.* ¶ 8-10]. At this time, Mr. Johnson was sitting in the driver's seat and Scott Jackson was sitting in the front passenger seat [*id.* ¶ 11]. Mr. Johnson recalls the free air sniff taking about two minutes [52-1 at 126-27]. Officer Bender says his canine "immediately" alerted to the scent of illegal drugs in the front passenger side of the vehicle and that this happened within two minutes of his arrival on the scene or by 10:13 p.m. [54-3 ¶ 13].

After the canine alerted, Deputy Phillipy asked Mr. Johnson and Mr. Jackson to exit the vehicle [52-1 at 130]. Deputy Phillipy was on the driver's side of the vehicle, while Deputy Leckrone and Officer Bender were on the passenger side [52-1 at 130, 179; 52-2 ¶ 14, 17]. When the passenger, Mr. Jackson,

2

exited the vehicle, Deputy Leckrone frisked him and found a small plastic baggie inside a paper coin sleeve containing crystalline rocks [52-2 ¶ 18; 54-3 ¶ 24]. Deputy Leckrone and Officer Bender examined the baggie and, based on their training and experience, suspected it was methamphetamine [54-3 ¶ 24]. Mr. Jackson tried to run from the scene, but the officers stopped him [*id.* ¶ 25]. Mr. Jackson was then placed in handcuffs and read his *Miranda* rights [52-3 ¶ 18]. The officers field tested the substance, which tested positive for methamphetamine [54-3 ¶ 27; 54-3 PDF 8].

Meanwhile on the driver's side, Deputy Phillipy told Mr. Johnson that he was being detained because the canine alerted to the presence of narcotics in his truck [52-1 at 142]. He placed Mr. Johnson in handcuffs and read him his *Miranda* rights [*id.* 138]. Deputy Phillipy frisked or patted down Mr. Johnson once [*id.* 179; 52-2 ¶ 16]. This occurred after Deputy Leckrone frisked Mr. Jackson, discovered the drugs, and he attempted to flee [52-2 ¶ 21]. Mr. Johnson also says that several other unidentified officers also frisked him [52-1 at 179]. Officer Bender did not frisk Mr. Johnson, did not see Deputy Phillipy or anyone else frisk him, and did not see Deputy Phillipy place him in handcuffs [52-1 at 131; 54-3 ¶ 21-23]. Deputy Leckrone did not frisk Mr. Johnson or otherwise interact with him at any point [52-1 at 131; 52-3 ¶ 20]. As Mr. Johnson was standing there, several officers around him insulted him [52-1 at 139].

Based on the canine alert, small baggie of methamphetamine found on Mr. Jackson, and his attempt to flee, Officer Bender searched the vehicle [*id.* ¶ 29]. This took approximately five minutes [*id.* ¶ 30]. He did not find any drugs [*id.* ¶ 31]. He advised Deputy Phillipy that he did not find any drugs during the search [*id.* ¶ 33].

Deputy Phillipy issued Mr. Johnson a traffic warning for "no headlights when required" [52-2 ¶ 11, 24; 52-12]. Mr. Johnson claims he never received a written warning but admits he may have forgotten [52-1 at 35-36, 38, 142]. Deputy Phillipy removed Mr. Johnson's handcuffs and told him he was free to leave [*id.* 141; 54-3 ¶ 33]. Mr. Johnson did not sustain any physical injuries from the traffic stop [52-1 at 145-46]. He returned to his vehicle and departed [54-3 ¶ 33].

3

Officer Gouveia arrived on the scene at approximately 10:24 p.m., after Mr. Johnson and Mr. Jackson had been placed in handcuffs and after the search of the vehicle, but before Mr. Johnson was unhandcuffed and departed [54-4 ¶ 5-6, 13]. He was there for no more than five minutes and left because he was told the other officers did not need his assistance [54-4 ¶ 7, 20].

Mr. Jackson was arrested for possession of methamphetamine, placed in Deputy Phillipy's squad car, and transported to the Wabash County Jail [52-2 ¶ 27, 30]. Because of this, Deputy Phillipy had to complete certain paperwork and reports on scene before transporting him to the jail [*id.* ¶ 28]. Deputy Phillipy informed central command that he was transporting Mr. Jackson to the jail at 10:37 p.m. [*id.* ¶ 30].

Mr. Johnson estimates that no more than fifteen minutes passed from the time he was first stopped until the time he departed [52-1 at 141]. The Wabash County Sheriff's case report does not document the times that each officer left the scene, but no more than thirty-two minutes passed from the time Deputy Phillipy first pulled Mr. Johnson over at 10:06 p.m. to the time that the dispatch operator logged all officers off the call at 10:38 p.m. [54-5].

Before October 1, 2020, Mr. Johnson believes that a law enforcement officer visited his place of employment, the Bowen Center, and falsely claimed that he had an outstanding warrant for a drug offense and that he was a convicted felon, resulting in his termination [52-1 at 109-113, 187]. Though Mr. Johnson suspects this was Officer Drew Bender, he cannot say Officer Bender actually did this because he has no evidence [52-1 at 106-109]. Officer Bender never spoke to anyone at the Bowen Center or any of Mr. Johnson's other employers about him [54-3 ¶ 51-52]. Deputies Corey Phillipy and Derek Leckrone likewise never had any contact with any of Mr. Johnson's employers [52-2 ¶ 31; 52-3 ¶ 22].

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

4

non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011). In a case involving crossmotions, each party receives the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

## DISCUSSION

A. *Mr. Johnson's Affidavit.*

The court begins by addressing Mr. Johnson's affidavit. Seemingly in response to the two motions for summary judgment, Mr. Johnson filed a two-paragraph affidavit. In it, he repeats the allegations from this amended complaint: he concludes that his Fourth Amendment rights were violated and he was falsely arrested. His affidavit draws mere legal conclusions rather than offer facts, and it contains hearsay. It purports to contradict his deposition testimony. The entire second paragraph concerns an unnamed law enforcement officer.

Affidavits presented in opposition to a motion for summary judgment must be based upon personal knowledge and must set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4).

Inadmissible hearsay contained in affidavits may not be considered. *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985). Conclusory assertions without any factual support are also insufficient to create a genuine issue of fact. *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003); *Hadley v. Cnty. of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). A party opposing a motion for summary judgment cannot create sham issues of fact by filing affidavits that contradict prior deposition testimony. *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005).

Mr. Johnson's affidavit falls short of these requirements. Much of it attempts to transform the allegations into admissible evidence. *See, e.g., Resolution Tr. Corp. v. Juergens*, 965 F.2d 149, 152 (7th Cir. 1992) (purported affidavit that was "really a brief, laden with conclusory legal statements and barren of any relevant facts of which [non-moving party] had personal knowledge" was properly excluded from consideration under Rule 56(e)). Rule 56 makes clear that Mr. Johnson cannot merely rest on the allegations in his pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Reed v. Amax Coal Co.*, 971 F.2d 1295, 1299 (7th Cir. 1992).

Mr. Johnson's affidavit is short on specific facts. The only specific facts the court can identify are the following: "[I was detained] for over 30 mins […] I had my lights on when I was getting into the streets and my headlights were on as I was on the street. I was never handed a warning before I even left the screen it just showed up in my paperwork. I know in my deposition I said I was detained for 15 min[ute]s but I meant that I was in handcuffs for that long and search[ed] three times by three different officers." [71 ¶ 1].

A party cannot defeat a summary judgment motion with an affidavit that contradicts the party's earlier sworn deposition testimony. *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020). At his deposition, Mr. Johnson stated that he was detained for only fifteen minutes. The court must disregard Mr. Johnson's

new testimony that he was actually detained for thirty minutes and was handcuffed for fifteen. *Id.* Even taking the remaining facts as true, Mr. Johnson has not created a genuine issue for trial and it is apparent that the defendants are entitled to summary judgment.

    B.  *Fourth Amendment.*

Mr. Johnson alleges violations of the Fourth Amendment under 42 U.S.C. § 1983. The Fourth Amendment prohibits "unreasonable searches and seizures" by the government to safeguard "[t]he right of the people to be secure in their persons." U.S. Const. amend. IV.

Section 1983 serves as a procedural vehicle for lawsuits "vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To establish a § 1983 claim, he must show that he was "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). He may bring a § 1983 claim only against those individuals "personally responsible for the constitutional deprivation." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002).

Mr. Johnson also raises failure to intervene claims. To prevail on his § 1983 failure to intervene claims, Mr. Johnson must prove: (1) "an underlying constitutional violation, (2) that the officers "knew that the constitutional violation was committed," and (3) that the officers "had a realistic opportunity to prevent it." *Baker v. City of Chi.*, 483 F. Supp.3d 543, 558-59 (2020).

Mr. Johnson seems to allege multiple Fourth Amendment violations and instances when officers failed to intervene—in initiating the traffic stop, in conducting a canine sniff, in conducting a pat-down search, in searching his vehicle, and in using handcuffs. The court walks through each to determine that no reasonable jury could determine that the officers violated the Fourth Amendment. Because there were no constitutional violations, the court must grant summary judgment on the failure to intervene claims too.

1. *Traffic Stop.*

First, Mr. Johnson says the traffic stop violated the Fourth Amendment. A law enforcement officer may conduct an investigatory stop if that officer has a reasonable suspicion supported by articulable facts that criminal activity is afoot. *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)); *see also United States v. Bullock*, 632 F.3d 1004, 1014-15 (7th Cir. 2011). Reasonable suspicion is more than a hunch but less than probable cause, and it requires objective justification for making a stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). When determining whether reasonable suspicion exists, courts must assess the "totality of the circumstances to assess whether the detaining officer has a particularized and objective basis for suspecting illegal activity." *United States v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005) (quotation omitted). This assessment is based on "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). To comply with *Terry*, first the investigatory stop must be lawful. *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). This condition is satisfied when an officer "reasonably suspects that the person apprehended is committing or has committed a criminal offense." *Id.*

Before initiating the traffic stop, Deputy Phillipy observed that a driver, later determined to be Mr. Johnson, was operating a pickup truck without headlights at night. This was in violation of Indiana law. *See* Ind. Code § 9-21-7-2(a) ("each vehicle upon a highway between the time from sunset and sunrise […] must display lighted head lamps…"); Ind. Code § 1-1-4-5(a)(7) (defining highway to include "county bridges and state and county roads"). Mr. Johnson admits that he did not turn his headlights on until he got to the street [52-1 at 32-33, 180]. When Deputy Phillipy approached and asked if Mr. Johnson knew why he had been pulled over, Mr. Johnson said "[p]robably [for] not having my headlights on" [52-1 at 32, 40; 54-2 at 2; 54-5 at PDF 3].

8

Deputy Phillipy had reasonable suspicion for initiating the traffic stop because he believed he had observed a violation of Indiana law. *See United States v. Cole*, 21 F.4th 421, 428 (7th Cir. 2021) (*en banc*) ("The question, however is whether [the officer] reasonably believed he saw a traffic violation, not whether [the driver] actually violated the statute."); *United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019) ("If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution."); *United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006) (police can initiate traffic stop even when driver violates minor traffic law). The traffic stop did not violate the Fourth Amendment and no reasonable jury could say otherwise.

2. *Canine Free Air Sniff.*

Mr. Johnson says that he was subjected to prolonged detention during the stop. He seems to allege that the canine free air sniff made the stop unreasonably long. A free air sniff of a vehicle conducted by a drug-detecting dog "is a measure aimed at detecting evidence of criminal wrongdoing." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (quotation and citation omitted). It is so minimally invasive that it does not constitute a "search" or "seizure" for Fourth Amendment purposes. *United States v. Place*, 462 U.S. 696, 707 (1983); *see also United States v. Taylor*, 596 F.3d 373, 376-77 (7th Cir. 2010) ("It is well-established [] that the use of a drug-sniffing canine in the course of a traffic stop does not constitute a search, and therefore does not itself violate the Fourth Amendment.").

But a lawful *Terry* stop cannot continue indefinitely. *See United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021). A stop that lasts too long becomes an unreasonable seizure or "a *de facto* arrest that must be based on probable cause." *Id.* When law enforcement officers have reasonable suspicion to make a routine traffic stop, they may walk a drug-detecting dog around the vehicle to conduct a free air sniff to detect the presence of drugs in the vehicle without having any suspicion that the vehicle contains drugs or contraband so long as this does not unreasonably prolong the length of the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also Rodriguez,* 575 U.S. at 355; *United States v. Taylor*, 596 F.3d at 376-77. The part

of the traffic stop that is relevant for this inquiry is "the time leading up to the dog alert." *United States v. Garrett*, 139 F. Appx. 720, 723 (7th Cir. 2005).

Here, the undisputed facts establish that Deputy Phillipy initiated the traffic stop at 10:06 p.m. [52-1 at 32, 40; 54-2 at 2; 54-5 at PDF 3]. After briefly speaking with Mr. Johnson about the reason for the stop, Deputy Phillipy returned to his squad car to run Mr. Johnson's information and registration [52-2 ¶ 10]. He began writing out a warning for driving with no headlights [*Id.* ¶ 11]. At 10:08 p.m., he requested that Officer Bender come to the scene because he recognized Mr. Johnson from executing a search warrant where drugs were seized [*Id.*; 54-5 at PDF 3]. Officer Bender arrived quickly [52-1 at 52], no more than five minutes after the traffic stop was initiated or by 10:11 p.m. at the latest [54-3 ¶ 7]. After "briefly" speaking with Deputy Phillipy, Officer Bender retrieve his canine from his car (which "probably took [] 30 seconds") and began the free air sniff [54-3 ¶ 8-9]. Mr. Johnson recalls the free air sniff taking about two minutes [52-1 at 126-27]. Officer Bender says his canine "immediately" alerted to the scent of illegal drugs in the front passenger side of the vehicle and that this happened within two minutes of his arrival on the scene or by 10:13 p.m. [54-3 ¶ 13].

The total time is not the litmus test for a prolonged stop but instead whether officers had completed the purpose of the stop. *See Rodriguez*, 575 U.S. at 354. Deputy Phillipy didn't complete the written warning and give it to Mr. Johnson until after the alert [52-2 ¶ 11, 24; 52-12]. Mr. Johnson has presented no evidence to show that the traffic stop could have been completed by 10:13 p.m. Mr. Johnson presents no evidence to show that Deputy Phillipy already completed the tasks associated with the traffic stop—including checking his license, determining whether there are outstanding warrants against him, inspecting the vehicle's registration and proof of insurance, and issuing the written traffic warning—by the time the K-9 alerted. *See, e.g.*, *United States v. Stewart*, 902 F.3d 664, 672 (7th Cir. 2018); *United States v. Offord*, 788 F. Appx. 384, 387 (7th Cir. 2019) (time from the initial stop to the dog alert was not unreasonably prolonged when the officer was processing the passenger's outstanding arrest warrant and

10

briefing another officer who arrived on the scene); *Garrett*, 139 F. Appx. at 723 (recognizing that a positive alert within five to ten minutes of the initiation of a traffic stop "would likely" be reasonable because it is unlikely that the initial purpose of the traffic stop could be completed in such time). No reasonable jury could say the canine search unreasonably prolonged the traffic stop.

        3. *Pat-Down Search.*

Mr. Johnson also argues that his Fourth Amendment rights were violated when the officers asked him to get out of the vehicle and frisked him. Law enforcement may order a driver out of a vehicle after a lawful traffic stop without violating the Fourth Amendment. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *see also Maryland v. Wilson*, 519 U.S. 408, 412 (1997). To proceed from a stop to a frisk, the officer "must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona*, 555 U.S. at 327; *United States v. Brown,* 188 F.3d 860, 864 (7th Cir. 1999) ("must also be able to point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others."). An officer need not be absolutely certain that the individual he is about to frisk is armed; the issue is whether a reasonably prudent person under the circumstances would be warranted in the belief that his or her safety or that of others was in danger. *Terry,* 392 U.S. at 27.

Here, after the canine positively alerted to the scent of illegal drugs in the front passenger side of the vehicle, Deputy Phillipy asked Mr. Johnson and Mr. Jackson to exit [52-1 at 130]. After Deputy Leckrone frisked Mr. Jackson on the passenger side, found a small plastic baggie containing crystalline rocks which he suspected to be methamphetamine, and stopped Mr. Jackson from fleeing the scene [52-2 ¶ 18; 54-3 ¶ 24-25], Deputy Phillipy frisked Mr. Johnson once [52-1 at 179; 52-2 ¶ 16].

No reasonable jury could say that Deputy Phillipy lacked reasonable suspicion that Mr. Johnson might be armed and dangerous when a drug-detecting dog alerted positively outside his car, knowing that drug crimes are often infused with violence. *See United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007)

11

("some crimes by their very nature are so suggestive of the presence of and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual may be involved in such a crime"); *see also United States v. Gambrell*, 178 F.3d 927, 929 (7th Cir. 1999) (drug dealing is a "crime infused with violence" such that "[g]uns are among the tools of the trade"). This is especially true when Mr. Johnson's passenger had already been searched, found with suspected contraband, and attempted to flee, and when law enforcement was already familiar with Mr. Johnson due to his presence at a residence where drugs were seized. Mr. Johnson presents no evidence to show that Deputy Phillipy lacked reasonable suspicion to frisk him.

Mr. Johnson's general allegations that two other unidentified officers frisked him aren't enough to survive this "put up or shut up" moment of the lawsuit, *see Springer v. Durfliger*, 518 F.3d 479, 484 (7th Cir. 2008), as Mr. Johnson marshals no evidence as to who these officers were or why these pat downs were unreasonable. No reasonable jury could conclude that the frisking of Mr. Johnson violated his Fourth Amendment rights.

    4. *Search of Vehicle.*

Mr. Johnson also alleges that the search of his vehicle was unconstitutional. But a warrantless search of a vehicle is valid under the Fourth Amendment when a police officer has probable cause. *Almeida-Sanchez v. United States*, 413 U.S. 266, 269 (1973). A drug-detecting dog's positive alert provides probable cause when "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013); *see also United States v. Hernandez*, 24 F. Appx. 560, 562 (7th Cir. 2001) ("A dog's alert *alone* supplies probable cause that drugs are present.").

To the extent Mr. Johnson alleges that the vehicle search unreasonably prolonged his detention, he presents no evidence on which a reasonable jury could rely to make this finding. "As soon as a dog alerts during a traffic stop and provides the officers with probable cause to believe that a car contains

12

drugs, the officers have a new justification to extend a traffic stop." *Garrett*, 139 F. Appx. at 723; *Florida v. Royer*, 460 U.S. 491, 506 (1983) (positive dog alert would justify turning investigative detention into arrest). Here, the K-9's positive alert supplied the officers the probable cause they needed to search the vehicle and detain Mr. Johnson during the search. No reasonable jury could say otherwise.

5. *Use of Handcuffs.*

Finally, Mr. Johnson alleges that the use of handcuffs violates the Fourth Amendment. Under the Fourth Amendment, a "person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury." *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014); *see also Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (collecting cases describing when the use of handcuffs constitutes excessive force, including when officers "refus[e] to loosen plaintiff's chafing handcuffs," and where tight handcuffs caused nerve damage or a "sprained wrist, shoulder, and elbow") (citations omitted)). However, nothing on this record shows that the handcuffs inflicted pain or injury or that Mr. Johnson posed no risk of flight or threat.

Instead, Mr. Johnson posed a flight risk and a potential threat to Deputy Phillipy such that the use of handcuffs was reasonable. A routine traffic stop had escalated when the canine positively alerted to the scent of illegal drugs [54-3 ¶ 13]. From there, suspected drugs were found on the passenger, and he tried to run from the scene [*id.* ¶ 24-25]. Deputy Phillipy placed Mr. Johnson in handcuffs, read him his *Miranda* rights, and frisked him [52-1 at 138, 179]. Then he conducted a pat down search [*id.* 179; 52-2 ¶ 16]. Later, Mr. Johnson's handcuffs were removed, and he was told he was free to leave [52-1 at 141; 54-3 ¶ 33]. Mr. Johnson did not sustain any physical injuries from the traffic stop [52-1 at 145-46]. Mr. Johnson presents no evidence on which a reasonable jury could rely to find that the use of handcuffs was excessive force. As no constitutional claims remain against the officers, the court need not address qualified immunity.

13

C. *False Arrest, False Imprisonment, Defamation, and City of Wabash Liability.*

Mr. Johnson also brings several other broad claims: that the incident amounted to false arrest and false imprisonment under Indiana law, that Officer Bender defamed him, and that the City of Wabash is liable for state torts committed by its law enforcement officers under *respondeat superior*. He addresses none of them substantively in his summary judgment briefing. This is the time in which the record is tested to see whether a reasonable jury could find for a party. *See Springer*, 518 F.3d at 484. An undeveloped argument based on Mr. Johnson's theories won't carry the day. *See Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) ("However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture."). The court won't craft argument for Mr. Johnson on these claims. *See Gross v. Town of Cicero*, 619 F.3d 697, 704-05 (7th Cir. 2010). "To survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict in [his] favor.'" *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)). After careful review of the record and governing law, Mr. Johnson hasn't presented any evidence to support the remaining claims, much less established a genuine issue for trial, so summary judgment is granted for the defendants. Although the court often will remand or dismiss state law claims in favor of a state forum when all federal claims have been adjudicated, under the circumstances here, particularly without any serious contest, the court grants summary judgment.

## CONCLUSION

Accordingly, the court GRANTS the motions for summary judgment for all defendants [51, 53] and Attorney Adam Willfond's motion to withdraw as attorney [75]. This order terminates the case.

SO ORDERED.

March 27, 2024                                  *s/ Damon R. Leichty*
                                                Judge, United States District Court